**In the Interest of W.C., K.A.C., L.C.D., D.J.D., and S.T.D.**

No. 2–01–384–CV.

Court of Appeals of Texas, Fort Worth.

Feb. 6, 2003.

James Bruce Harris, Wichita Falls, for appellant.

C. Ed Davis, General Counsel, Texas Department of Protective and Regulatory Services, Phoebe Knauer, Deputy General Counsel, Cathy Morris, Chief Attorney for Field Operations, Lana S. Shadwick, Appellate Attorney, Special Litigation, and Sarah R. Guidry, Supervising Attorney for Field Operations–Special Litigation, Houston, for appellee.

Panel A: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

Appellant S.C. appeals from the trial court's judgment terminating her parental rights to her five children. In a single issue, appellant contends there is insufficient evidence to support the jury's finding that termination of her parental rights was in the children's best interests. Because we conclude the evidence is factually insufficient to support the jury's best interest finding, we reverse the trial court's judgment and remand this cause to the trial court for a new trial.

## BACKGROUND FACTS

The Texas Department of Protective and Regulatory Services first received a referral on appellant in 1996 and then again in 1997. Both of these cases were closed with no action being taken by the Department.

In July 1999, appellant filed charges against D.D., her husband and the father of L.C.D., D.J.D., and S.T.D., for abusing six month old D.J.D. After going to the police, she took D.J.D. to the emergency room and then went back home with the children and D.D. A few days later, the Department visited appellant and told her she needed to leave. She left with the children for one night and then returned back home and told D.D. he had to leave, which he did. D.D. was arrested in October 1999, charged with injury to a child, and ultimately sentenced to jail.

As a result of this incident, appellant signed a service plan with the Department, which she followed. Appellant attended parenting classes and counseling sessions. She tried to get a divorce, but could not do so through legal aid because children were involved. Appellant worked with the Department through December 1999, when her case was closed.

In April 2000, after D.D. was released from jail, appellant allowed him to move back in with her and the children. The following June, when S.T.D. was only three weeks old, D.D. broke S.T.D.'s leg. Appellant was at work when the incident occurred. She discovered it the following afternoon while changing S.T.D.'s diaper and rushed S.T.D. to the hospital. The Department was notified and stopped D.D. from trying to keep the remaining children. Based upon appellant's failure to protect the children, the children were removed from her care seven days later. Following the children's removal, it was learned that D.D. had been sexually abusing K.C.

The State filed its original petition seeking termination of appellant's parental rights on June 9, 2000. The trial court rendered a directed verdict on the grounds for termination under section 161.001(1), subsections (D) and (E), finding as a matter of law that appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well being and that appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E) (Vernon 2002). A jury found that termination of the parent-child relationship was in the children's best interests. The trial court adopted the jury's findings and entered an order terminating appellant's parental rights to all five children.[1]

### BURDEN OF PROOF IN TERMINATION PROCEEDINGS

■ A parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *accord Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, stated, "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000).

■ In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and, must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001. Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. *Santosky,* 455 U.S. at 746, 102 S.Ct. at 1391; *see also* TEX. FAM.CODE ANN. § 161.001.

■ Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established."

1. The fathers of L.C.D., D.J.D., S.T.D., and K.C. voluntarily relinquished their parental rights. The trial court also terminated the parental rights of W.C.'s father, who has not appealed. Only the mother's parental rights are at issue in this appeal.

TEX. FAM.CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 268 (Tex.2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington*, 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re A.V.*, 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

## FACTUAL SUFFICIENCY

In her sole issue on appeal, appellant challenges the factual sufficiency of the evidence to support the jury's finding that termination is in the children's best interests.

### Standard of Review

The Texas Supreme Court recently clarified the appellate standard of review of a factual sufficiency challenge in light of the clear and convincing evidence burden of proof required in termination proceedings. *C.H.*, 89 S.W.3d at 25. Noting that a finding based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance, the court held that the proper standard for reviewing termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id.* Emphasizing that appellate courts must main-

tain the respective constitutional roles of juries and reviewing courts, the court cautioned that an appellate court's review must not be so rigorous that the only factfinding that could withstand review are those established beyond a reasonable doubt. *Id.* at 26. With this standard in mind, we turn to the facts of this case.

### Best Interest

There is a strong presumption that a child's best interest is served by keeping custody in the natural parent. *In re D.M.*, 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.); *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 676 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.). The fact finder may consider a number of factors in determining the best interest of the child, including:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future emotional and physical danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist those persons in promoting the best interest of the child;

(6) plans for the child by the individual seeking custody;

(7) stability of the home or proposed placement;

(8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976).

■ "Best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *Id.* A fact finder is not required to consider all of the listed factors and may reasonably form a strong belief or conviction regarding the interest of the child in the absence of evidence about some of these factors, particularly if the evidence were undisputed that the parental relationship endangered the child's safety. *See C.H.*, 89 S.W.3d at 27. Quite often, the best interest of the child is infused with the statutory offensive behavior. *D.M.*, 58 S.W.3d at 814. While there are instances where the offending behavior will demand termination of parental rights, there are also those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior. *Id.* Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere. *Id.* Termination should not be used to merely reallocate children to better and more prosperous parents. *Id.* In reviewing appellant's factual sufficiency challenge, we will review the evidence under the applicable *Holley* factors and other relevant factors.

### Desires of the Children

■ At the time of trial in this case, W.C. was nine years old, K.C. was five, L.C.D. was four, D.J.D. was two, and S.T.D. was one year old. W.C. expressed a desire to return to his mother. However, just before trial, W.C. brought up the court hearing. When asked if he was okay, he responded, "Yeah. At the end of this week I'm going to get adopted."

K.C. stated on one occasion that she missed her mother. K.C.'s foster mother testified that K.C. expressed fear at being

returned to her mother and asked that she not be made to go home with her. The children's guardian ad litem also testified that, the evening before trial, K.C. stated she was afraid to go home. The Department also noted that both K.C. and L.C.D. expressed feelings of safety in their foster home, unlike their home. L.C.D. also expressed fear of further abuse if returned home. D.J.D. and S.T.D. were too young to express their wishes.

### Emotional and Physical Needs and Dangers to the Children

There was no evidence presented regarding appellant's failure to meet the children's physical needs in the past with regard to food, clothing, or housing. The record reflects that appellant regularly sought medical treatment for the children. There is evidence, however, that appellant repeatedly placed the children in physical and emotional danger by allowing them to live in an abusive and chaotic environment. Appellant admitted to having a history of abusive relationships. After D.D. injured D.J.D., appellant took the children back home with D.D. and only left when the Department told her she needed to do so. While D.D. was in jail for injuring D.J.D. and the children were under appellant's sole care, appellant had trouble properly supervising the children and keeping them in a safe environment. W.C. would hit a lot, climb out his bedroom window, and take off when he got angry. K.C. would throw very bad temper tantrums and was once found wandering in a park by police. On another occasion, three of the children were burned while playing unsupervised by the kitchen stove near a pan of hot grease. When D.D. was released from jail, appellant allowed D.D. to move back with her and the children. Less than three months later, D.D. broke S.T.D.'s leg. While there is evidence appellant sought appropriate medical care for the children when they were injured, the jury

could have determined that it was her actions or lack of supervision that contributed to the children's injuries. There was also some evidence that she failed to follow up on medical care as instructed and failed to obtain required medication with regard to the hot grease burns K.C. received.

The evidence also shows appellant has had frequent changes of residences and multiple jobs. In the two years before trial, appellant lived at several different residences; one of those moves was to get a bigger apartment because she was told that two of her children were going to be returned to her, and another was for safety reasons. Appellant could not recall "offhand" how many places she had lived since W.C. was born. The evidence further shows appellant has had five different jobs within the nineteen-month period before trial.

There is evidence that the three eldest children—W.C., K.C., and L.C.D.—have severe emotional problems. Dr. Sabine, the psychologist hired by the Department to evaluate appellant and the children, testified that the level of the behavior disorders and emotional disruptions exhibited by the children rarely happens because of a single trauma, but usually indicates a pervasive pattern of abuse or neglect that has taken place over a period of time. Based upon his meetings and evaluations of the children and appellant's reports to him, he believed the children had lived in a "very chaotic and violent home" and that this was the most likely reason for the children's behavior problems. Dr. Sabine testified that the severity of the three oldest children's disorders were in the top ten percent of children in foster care who have come through difficult situations. He recommended that the children will need significant care, that they are going to be a challenge for even the most well-equipped caregivers, and that they might need residential treatment or more structured treatment in the future.

Specifically, Dr. Sabine testified that W.C. suffered from three behavioral disorders: oppositional defiant disorder, depressive disorder, and anxiety disorder. W.C.'s counselor, Chris Fletcher, also testified about W.C.'s symptoms related to depression and anxiety and his behavior problems. W.C. talked to him about the abuse that occurred in W.C.'s home and the fact that he felt he had to take care of his younger siblings because appellant was unable to do so. While the evidence showed W.C. had improved since removal, he still had serious emotional problems.

With regard to K.C., Dr. Sabine diagnosed her with four behavioral disorders: depressive disorder; posttraumatic stress disorder, which he strongly suspected was due to things she had experienced in her life up to this point; attention deficit hyperactivity disorder; and disruptive behavior disorder. When he first began seeing K.C., he noted serious behavior problems both at the evaluation session and at the children's home where she had been staying, including her complete refusal to respond or cooperate, running or trying to run away, and concerns of aggressiveness toward other children. He felt strongly that her emotional disturbances were sufficiently severe to preclude contact with her family. While K.C. had improved since he began seeing her, he testified that she still has many problems; she makes herself throw up at times; she does not express the appropriate remorse or regret of a child her age; she is very immature for her age; she takes food from her siblings and has difficulty sharing; she is afraid to be left alone and needs constant attention; she has difficulty focusing for very long; she tattles constantly on both adults and children; she has a strong attention-seeking behavior; and she does not appear

able to take reassurance from those who are caring for her or to benefit from their care. In his evaluation of her just before trial, Dr. Sabine found K.C. more open and verbal, quite different and a marked improvement from his last evaluation of K.C. where she refused any interaction. Dr. Sabine recommended that K.C. be placed in an environment where she would have consistency, regularity, and predictability so that she could perhaps begin the process of healing and functioning at a much higher level. There was also evidence that K.C. was placed on medications for purposes of controlling her moods and aggression and that she would need continued proper and timely medication.

Dr. Wieck, a psychiatrist, also saw and treated K.C. He testified that K.C. suffered symptoms of irritability, mood instability, rage, and aggression and that she had physically attacked many of her care givers.

K.C.'s counselor, Diane Boddy, testified that when she first began seeing K.C., it was apparent she had safety and trust issues, which are usually parallel with some kind of abuse. K.C. talked to her about multiple instances of sexual abuse by D.D., stating that appellant was at home when the abuse occurred, that appellant saw the abuse occur on at least one occasion, and that appellant did nothing and was afraid to tell anybody. Boddy testified K.C. has a low frustration level and was a "master" at throwing "out-of-control" tantrums, often becoming aggressive towards other children. Because K.C. appeared to have more difficulty with tantrums following family visitations, Boddy recommended that K.C. stop the visits. Once stopped, K.C.'s behavior improved. However, the cessation in family visits also coincided with K.C. beginning medication, and the medication could have had a big part in the improvement. Overall, Boddy testified that K.C. is very bright, responds well to therapy, and has shown "tons of improvement." Her tantrums are at a much lower level and fewer and farther between. Further, she is much happier and "settled," easier to talk to, and smiles more. Boddy further testified that a stable and structured home environment, with a calm and nonchaotic lifestyle, is "absolutely imperative" for K.C. and that she would likely regress without such an environment.

As for L.C.D., Dr. Sabine testified that when he first saw L.C.D., two months after her removal, she was somewhat speech delayed and had some significant behavior problems; she was noted to choke herself until she threw up and to defecate or urinate when upset, even though she had been potty trained. He also noted that she had been acting in "fairly amazing ways" to take care of her younger siblings. She also appeared behind in her cognitive development. Based on her behavior at evaluation sessions, Dr. Sabine diagnosed L.C.D. with depression, anxiety, and an attachment disorder. He noted that attachment disorders in children, such as that seen in L.C.D., usually occur when the child has been abused or neglected and has been deprived of necessary things she needs to form primary attachments. Dr. Sabine testified that L.C.D. experienced some improvement while in foster care; she had become less aggressive, seemed more compliant, and was more willing to interact. However, she still expressed a depressed mood and anxiety at separation from her foster parents and had acted in ways that suggested she had been sexually abused in the past. In his opinion, L.C.D.'s chances for improvement were better if she were not returned to appellant.

Stephanie Patton, L.C.D.'s therapist, testified she had been working with L.C.D.

for fourteen months and that she had both reviewed and agreed with Dr. Sabine's assessments. She noted improvements in L.C.D. over this time, while also noting that she needs continued treatment. In her opinion, L.C.D. needs a consistent, stable environment; ongoing treatment; and possible medication.

Julie Turnbow, the foster mother of K.C., L.C.D., and D.J.D., testified that the children were aggressive with each other, but that D.J.D. was more aggressive towards her. Further, she stated the aggression was worse after visitations with appellant. The children behaved through constant arguing, hitting, and shoving, and both K.C. and L.C.D. throw tantrums, engage in inappropriate sexual behaviors, and had recently begun wetting the bed. K.C.'s tantrums, although they decreased over the year preceding trial, had also begun increasing in the month before trial.

The children's guardian ad litem, Gwen Morman, testified she had seen all of the children, except for S.T.D., approximately twelve to fifteen times over the last year and a half. She stated that the children had improved in their relationships with each other and in their relationships with adults in general in that time. She believed it was not in the children's best interest to be returned to appellant and that appellant's parental rights to the children should be terminated. She based her opinion on the children's level of emotional problems and the abuse and repeated harm they suffered while with appellant.

No evidence, direct or indirect, was offered by the Department regarding S.T.D.'s future emotional or physical needs or any possible endangerment to him in the future.

### Parental Abilities and Available Programs

As for appellant's parental abilities, the evidence, as set forth above, shows it was appellant who placed the children or allowed the children to remain in dangerous, harmful situations or in situations where they were not properly supervised. Appellant testified that although she was afraid of D.D., she let him move back in with her and the children after he was released from jail on the charge of injuring D.J.D. She admitted that letting her children stay with D.D. was not appropriate. She explained that she only did this after not being able to get help from the Department and other various agencies. However, appellant also testified she did not seek help from First Step, a place that provided protection for battered women and their children, even though she and the children had gone there before for a brief period. There was also testimony that W.C. felt he had to take care of his younger siblings because appellant was unable to do so.

Appellant testified she now realizes her responsibility for her children's injuries and recognizes that she engaged in conduct that put her children in danger. Through her counseling sessions and looking back on the years of abuse she and her children endured, she has grown a lot and knows it will never happen again. Appellant states she is a stronger person than before, even though she admits her "transformation" is not complete in that she still has some self-esteem issues and still lets men intimidate her. She admitted to a history of conflicts and abuse in her relationships with others, but believes she has changed. She admits that she has never made a decent choice in a partner, but has decided she does not need a man in her life and is confident she can go through things on her own.

With regard to the alleged sexual abuse of K.C., both appellant's mother and aunt testified that appellant was devastated when she learned D.D. had been sexually

abusing K.C. Her aunt stated that when appellant learned of K.C.'s specific allegations, she immediately went home, stripped her bed and threw the bedding in the dumpster, got rid of the girls' beds and bedding, and threw away everything that would remind the children of D.D.

Appellant's sister, mother, and aunt testified they had seen changes and improvements in appellant over the last year and a half. Appellant is a different and better person. She is happier, her self-esteem is much higher, and she is more open and willing to talk about things. They also testified about the close bond between appellant and the children. Appellant's sister testified this bond was evidenced by the children "flock[ing] to her" at visitations and then screaming, kicking, and being drug away from her when it was time to leave.

Appellant, as well as appellant's mother, sister, and aunt, testified that the children were well-behaved, although not perfect, when they were in appellant's care. Appellant did, however, testify about some serious problems she had with W.C. and K.C. while D.D. was in jail and she was solely responsible for the children. Appellant denied seeing any of the severe problems in the children that were described at trial.

Vee Tubbs, the visitation center coordinator who supervises parental visits and the volunteers that sit in on the visits, testified that she observed some of the visitations with appellant and the children. She stated that appellant and the children were bonded with each other, the older children being more bonded than the younger children. The children were glad to see appellant at their visits, and the older children were sometimes upset when she had to leave. She rated the visits "fair." With regard to appellant's parenting skills, she stated appellant had "pretty good strengths"; appellant does "pretty well" in handling all five children, uses appropriate disciplinary methods, and gives equal treatment to all the children. Appellant brought the children things every time she visited, such as home-cooked meals, toys, clothes, Christmas presents, and costumes at Halloween. When asked about any weaknesses, Tubbs stated she could not judge that. She did state that appellant brought family with her to approximately eighty percent of the visits, mostly her mother, even though extended family were generally allowed to visit only once a month. These family members, in her opinion, were "appropriate."

Susanne Taras, a child advocate volunteer who sat in on most of appellant's visits with her children, testified the children are very loving and affectionate towards appellant and that appellant returns their affection. She believes appellant and the children are bonded to one another and that the children are also bonded to one another. Appellant remembers the children's birthdays, brings them cakes, and always has something for them when she visits. She does "exceptionally well" with the children. Taras saw no more weaknesses in appellant's parenting abilities than that of other mothers. Appellant is equally affectionate with each child, disciplines them equally and appropriately, and has good patience with the children. The visits go very well, with the children being "pretty well-behaved" and appellant managing them fairly well. It is rare that she has any real problems with the children. While her mother came with appellant to visits, and Taras acknowledged that in the past appellant was overwhelmed without her mother's help, appellant had been without her on quite a number of visits lately and did very well. Taras acknowledged that the older children would help take care of the younger children, but felt

that was normal in a large family. Taras stated appellant has excellent support from her family, and she views them as a very loving family.

Wendy McGuire, appellant's therapist, testified about appellant's progress through the fifteen months she had been seeing appellant. While appellant was initially guarded, she quickly opened up and talked about the extreme remorse she felt for the injuries to her children and the actions of her husband, accepting full, if not all, responsibility for allowing him back into the home. She further testified, however, that while appellant accepted responsibility for the initial act, appellant also focused on the behavior of others in dealing with her problems of following through and being compliant. For instance, appellant focused on what the Department was not doing and upon the lack of support she was receiving, instead of what she could be doing. McGuire had concerns about how appellant reacts under stress and expressed reservations about appellant's ability to parent effectively under high amounts of stress. She also expressed concern that appellant had missed about six weeks of sessions in the months before trial and had only begun with her visits just before trial.

McGuire testified, however, that during the time she has been working with appellant, appellant has improved and showed "marked changes." Appellant had worked on, and accomplished, being more assertive and less aggressive; she now responds well and is more able to keep her anger and express it appropriately; her coping strategies have improved; and she has more insight with inter-personal relationships. McGuire also observed a positive change in the support from appellant's family and noted the "closeness" appellant had developed with her aunt over the year McGuire had been treating appellant. She

had encouraged appellant to find a good support system and believed appellant was taking advantage of that. She believed continued medication could also help appellant by stabilizing her mood so she could increase her coping skills; she observed marked changes in appellant's behavior since appellant began taking anti-depressant medication. Appellant indicated to her that she was currently taking her medication. In McGuire's opinion, if appellant established the stability of a good support system and took advantage of the various community resources, she could parent effectively. Appellant's constant conflicts with others and poor choice in men, however, coupled with the disorders exhibited by the three eldest children, caused her to have reservations about whether it would be in the children's best interests to go back to appellant. She had grave reservations about all five children being returned to appellant at once, noting that the plan was to integrate the children back in, one at a time. She did note that, on the one visit between appellant and the children that she had observed, appellant and the children played and interacted and had a "fun time."

Dr. Sabine testified that appellant had an average IQ with no evidence of any learning disabilities, but she suffered from major depression, with demonstrations of poor impulse control; difficulties with delays in gratification; and easy agitation, frustration, and hostility; immaturity; and some paranoid traits. He had reservations about appellant's ability to parent effectively, noting appellant's history of involvement with the Department and her history of living with abusive and alcoholic men and failing to protect her children in that environment. He felt appellant should "demonstrate the ability to care for her children effectively over time before she was allowed to function as a parent again."

Dr. Wieck, appellant's psychiatrist, began seeing appellant in May 2001. He diagnosed her with major depressive disorder and prescribed her an anti-depressant medication, which seemed to improve her condition. He gave her samples of the medication because they are expensive and because appellant had no other means of getting them. At a follow-up visit in June 2001, he gave her a six-week supply. Appellant failed, however, to make a follow-up visit in August, and he never saw appellant again. He believed appellant's depression was recurring, triggered by life stressors, such as the recent removal of her children, and he would recommend she continue on anti-depressant medication and individual counseling. In his opinion, depression disorder was not a reason for someone not to be a parent.

### Plans for the Children

With regard to her plans for the children, appellant admitted that support from her family had been bad in the past, but testified that she now has support from her sisters, parents, and an aunt. She has benefitted from her counseling and has more self-esteem. Appellant had been employed for three months at the time of trial, has benefits for herself through work, has looked into programs for the children, and can get help with the children's medication on a sliding scale program through work. She intends to seek help through Medicaid or the CHIP program, which she has looked into; to keep the children and herself in therapy; and to keep the children with the same therapists because they are bonded with those therapists. She also has permission for the children to work in therapy with graduate students, who are overseen by licensed psychologists. Appellant has recently obtained her driver's license and is waiting on a vehicle that her parents are going to give her, provided she keeps up the insurance. She has an application in with Habitat for Humanity for a home and intends to go to school to become a paralegal. She is currently going to church and is an active participant in the church, and she stated that both her own family and her church family have agreed to help her.

Appellant testified she is bonded to her four oldest children and is learning to bond with S.T.D., who was removed when he was an infant. In preparation for the children being returned to her, she has "baby-proofed" the trailer where she is living. She has painted, planted flowers, and bought new furnishings. She explained that she bought new furniture because she did not want anything around the house that might remind the children of the abuse they suffered by D.D. She took a minimum wage job, rather than working in a bar where she made more money, because of the perception that working in a bar conveyed and because it was better for her children.

As far as the children's social programs, she intends to keep W.C. in football, wants to enroll him in basketball because that is something he really wants to do, and wants to get him back into baseball. As for the girls, she intends to keep them in Camp Fire and wants to look in to dance classes because they have shown a desire to take them. Appellant also stated that her relationship with D.D. is over, and she is planning to file for divorce.

Both appellant's sister and mother believe appellant can meet the children's needs, and both testified they will help support appellant and the children. Appellant's aunt also stated she would help and support appellant and the children.

There was no evidence presented by the Department regarding any plans for adoption of any of the children. Dr. Sabine noted that it might be difficult to place K.C. because of her aggressiveness to-

wards others. He also acknowledged that she had already been in six foster homes since removal. Dr. Sabine further noted that the three oldest children might need some form of residential treatment in the future.

### Appropriateness of the Parent–Child Relationship

As for the parent-child relationship, there is testimony that W.C. felt he had to take care of his younger siblings because appellant was unable to do so. While appellant denied that W.C. was as much a caretaker of his younger siblings as she was, she admitted that W.C. perceives himself to be so. L.C.D. was also observed acting in "fairly amazing ways" to take care of her younger siblings. Taras, who has three children of her own, also testified that the older children would help take care of the younger ones, but did not find this odd because it is normal for older children often to take care of the younger children in a large family.

### Appellant's Compliance With Service Plans

Appellant stated she did everything the Department asked her to do. There was no evidence contradicting appellant's assertion; rather, evidence offered by the Department supported appellant's assertion. A review of the Department's various service and permanency plans shows appellant complied with her service plans in all respects, except for making her court ordered child support payments. She visited her children regularly and used proper discipline, and the children were generally well-behaved. She also completed a psychological evaluation; completed parenting classes; attended counseling, with

her therapist reporting significant progress throughout most therapy sessions; maintained employment; lives in her own apartment, which the Department deemed a safe living environment; completed random urinalysis, which were all negative; and made "significant progress in alleviating the causes for the children's removal from her home." The July 2001 service plan, which was made just months before the November termination hearing, shows appellant was able to meet the children's basic needs, had cooperated with other aspects of her service plan, and was making good progress in therapy.[2]

The Department specifically noted appellant's success in complying with her service plan tasks, but believed a risk of harm to the children still existed based on appellant's poor past judgment in her personal relationships and the children's behavior problems. The guardian ad litem's reports reflected her concerns over the children's behavior, her belief that appellant continued to be angry and continued not to accept responsibility for the abuse and neglect suffered by the children, and her belief that appellant had not changed enough to ensure the children's future safety.

### CONCLUSION

We are mindful that in some cases the best interest of the child is infused with the statutory offensive behavior, such as appellant's past actions in allowing D.D. to watch over her children, and that there are instances where the offending behavior will demand termination of parental rights. However, we also note there are those cases where the best interest deter-

---

**2.** The service plan also provided that the long-range goal for permanency was adoption. Both appellant and her therapist testified, however, that the Department was telling ap-

pellant that the children were going to be returned to her and that she should make preparations for their return. No evidence was presented contradicting these statements.

mination must have a firm basis in facts standing apart from the offending behavior. Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere. *D.M.*, 58 S.W.3d at 814. We conclude that this case is one where appellant's offending behavior is not egregious enough, on its own, to warrant a finding that termination is in the children's best interests. Accordingly, other independent facts must support the jury's best interest finding.

While there is evidence of poor parenting skills, poor decision making, and inadequate protection of the children in the past, the evidence is uncontradicted that appellant has done everything the Department required of her. There is evidence the Department told appellant, just months before trial, that her children were being returned to her and advised her to make preparations for their return. There was no significant event that occurred between the time the Department planned to return the children to appellant, either as stated in its service plans or through its statements to appellant, and the time they sought termination of appellant's parental rights. Rather, the Department based its termination decision on its belief that appellant's past conduct and poor judgment still posed a risk of harm to the children. The evidence shows however, that appellant has made significant progress, improvements, and changes in her life, and her insights and coping skills have improved, as well as her relationship with her family. The evidence also shows appellant and the children are bonded with one another, that appellant visits her children regularly, and that she obviously cares for her children. There is also evidence the children are making progress through therapy and that appellant has gained a good support system through her family and church. The record reflects there is nothing more appellant could have done in order to have her children returned.

After reviewing all the evidence presented and mindful of the fact that we may not reweigh that evidence or reassess the credibility of the witnesses, we conclude that, under all the record evidence, the jury's finding that termination of appellant's parental rights is in the children's best interests is not supported by factually sufficient evidence. We hold that the totality of the evidence in light of the factors outlined above is such that a reasonable fact finder could not form a firm conviction or belief that termination of appellant's parental rights is in the children's best interests. *See C.H.*, 89 S.W.3d at 25. We sustain appellant's sole issue on appeal.

Having determined the evidence is factually insufficient to support the jury's finding that termination of appellant's parental rights is in the children's best interests, we reverse the trial court's judgment and remand this cause to the trial court for a new trial.