

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-219-CV

IN THE INTEREST OF M.V., JR., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I.  Introduction

In one issue, Mother appeals the termination of her parental rights to her child, M.V., Jr. ("Michael"),[2] complaining that the evidence is insufficient to support the trial court's best interest finding.  We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

[2] We use an alias for the child's name.  *See* Tex. R. App. P. 9.8(b)(2).

## II. Factual and Procedural History

Mother began using cocaine when she was nineteen; she was twenty-four at the time of the termination trial. According to Tracy Clary, a Child Protective Services ("CPS") investigator, Mother told her that prior to her pregnancy she would use cocaine on the weekends, and during the first four months of her pregnancy, she used cocaine daily. Mother slowed her cocaine use to once a month after those first four months of pregnancy because her body could no longer tolerate it. Her average spending on cocaine was $400 to $500 per week.

In June 2008, Mother was convicted of prostitution, but she testified that she only engaged in prostitution twice while pregnant with Michael. Mother went to jail on two different occasions while pregnant with Michael.

On August 2, 2008, Mother entered the hospital and tested positive for cocaine. Michael was born the next day and tested positive for cocaine. Clary testified that when CPS removed Michael from Mother and placed him into foster care, Mother admitted that she was not in a position to provide adequate care for him.

Of the four names Mother gave Clary to investigate for voluntary placement with a relative prior to placing Michael in foster care, none were approved: one would not give to CPS the information it needed for a criminal

2

background check; two had CPS histories; and one had a criminal history. One of the individuals with a CPS history was Mother's brother, S.V.; another was her sister, M.V.[3]  M.V.'s CPS history involved drugs found in her home, although Mother testified that the drugs belonged to the father of M.V.'s children, who was no longer around.  M.V. testified that the children's father was not allowed to come to her house to see the children without his probation officer's signature because of the safety plan in place.  At the time of trial, Mother lived with M.V., who had three children, ages ten, six, and two.

The criminal history belonging to one of the other individuals — Mother's twenty-six year-old sister A.V. — was attributed to Mother using A.V.'s name and date of birth when arrested.  However, A.V. was not able to show paperwork at trial to account for the charges filed under her name, stating she had switched purses and "left all that information."  Mother testified that she had used both M.V.'s and A.V.'s names when convicted.  M.V. testified that her only real criminal history was a felony from 1998 for auto theft.

On August 6, 2008, three days after Michael's birth, Mother accepted an offer from the Department of Family and Protective Services ("DFPS") to

---

[3] A home study was subsequently conducted on another family member (a cousin), but she was not approved because of her youth and financial dependence on her father.

participate in Tarrant County's Family Drug Court program. Mother testified that she could not remember what happened the next day, when CPS was supposed to visit her home, stating "I think I went down the street or something." Mother was discharged from the Drug Court program on August 21, 2008, for lack of participation—specifically, her failure to appear. CPS caseworker Melanie Scott testified that Mother told her that she continued to use drugs while on the waiting list for the Drug Court program.

Between September and November 2008, Mother was convicted of criminal trespass and delivery of a controlled substance. In December, after she was released from jail and had moved to Austin to live with one of her sisters, she contacted CPS about seeing Michael and starting to work on her service plan.

By trial in June 2009, Mother had completed the first part of her parenting classes, set up her counseling sessions, submitted to drug testing, taken her psychological evaluation, visited Michael, and kept the job she had found at the end of February 2009. However, she tested positive on her June 2009 drug test, failed to provide proof of her attendance at Narcotics Anonymous meetings (which she testified she had started attending in June

4

2009),[4] and lived with M.V. because she could not get an apartment on her own due to her recent criminal history.[5] Mother testified that her June 2009 hair follicle drug test was positive because she had used cocaine three months before and that she had been attending the NA meetings but had left her paperwork at home.

Scott testified that Mother still seemed unable to financially support Michael and that according to her pay stub, Mother's net pay was $272.49 per forty-hour week. Mother testified that her paycheck was usually $320 per week, but up to $900 or $1,000 depending on overtime, with no insurance. Mother's visits with Michael were only once a month because she lived in Austin while he remained in foster care in Tarrant County—by trial, she had seen Michael five times. Scott acknowledged that the visits between Mother and Michael went fairly well, but she also noted that Mother had never expressed any concerns to her about whether Michael had any developmental

---

[4] Scott testified that, per Mother's psychological evaluation, it had been recommended that Mother attend Narcotics Anonymous ("NA") meetings two to three times a week. Mother was supposed to have a paper signed when she attended an NA meeting; Scott stated, "[E]very time I've kind of mentioned it to [Mother] about the Narcotics Anonymous, it's kind of like she really doesn't have time or it's really not a big deal."

[5] Mother testified that even apartments that accepted criminals with felonies would not accept her because her conviction was a drug charge felony and was too recent: "If [the conviction] was two years old or something, they would have me do an extra deposit."

needs and that Mother had never told her how she would afford day care or provide clothing for Michael.

By trial, Mother had not finished her parenting classes. Scott testified that Mother told her she had not finished the parenting classes because they conflicted with her work schedule. Mother testified that she could figure out a way to finish the parenting classes by dropping a shift at work.

Scott testified that it would be in Michael's best interest to terminate both parents' rights and that CPS's plan if those rights were terminated was for Michael to be adopted by his foster mother, who had expressed an interest in adopting him. She testified that Michael was thriving in his foster environment and described Michael and his foster mother as well-bonded in a good, safe, and stable home in a safe neighborhood.[6]

---

[6] Scott gave the following testimony:

Q. Have you observed [Michael's] foster mother's parenting skills and parenting abilities?

A. Yes.

Q. How would you describe them?

A. She has the best interest of that baby. She just takes excellent care of him. He's happy-go-lucky, he's thriving, he's happy, he's gaining weight.

Q. What have you seen [Michael's] foster mother do that leads

6

When asked how she would be able to take care of Michael if he were placed with her, Mother acknowledged her cocaine addiction and that she had "messed up back in the day," but she stated that she was changing and was different now than she had been in the past. She testified, "[T]hat's my first child, and I don't want to give up my first child like that, and I'm going to do everything I have to." As for day care for Michael, she testified that when her sister cleared her criminal background, "then I'll let her and I'll either get, like, help with day care or something." Scott testified that Mother was dependent on her sister for transportation, but Mother testified that she had a car and a driver's license but no car insurance. Mother testified that her plans for the future were to continue attending NA "[a]nd to keep on doing positive things and hanging around positive people and my family who is positive." She suggested that she could also go to her grandmother's house as a place to stay

you to believe she's a good parent?

A. She has a good, stable home. She has employment, she's always taking pictures of him, always talking about him. He's always dressed nice. He smells good.

Q. What's the interaction like between [Michael] and his foster mother?

A. He loves her. He knows who she is. He's bonded well with her.

7

and offered to provide her grandmother's name to CPS to do a home study.

Mother asked the trial court not to terminate her parental rights and to consider A.V. for placement if it found Mother was not in a position to take care of Michael. Mother also stated that, if the trial court did not find A.V. suitable, Mother would be willing to find another place to live so that M.V. could be considered for placement. The trial court terminated Mother's parental rights to Michael, finding that Mother had endangered Michael and that termination would be in Michael's best interest.[7] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (Vernon Supp. 2009). This appeal followed.

### III. Sufficiency of the Evidence

### A. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional

---

[7] The trial court also terminated Father's parental rights, but he does not appeal.

8

and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (Vernon 2008).

Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Best Interest of the Child

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt

11

and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Analysis

Mother complains that DFPS "presented scant or no evidence on many of the best interest factors," arguing that DFPS did not present any evidence on the number of out-of-home placements, any history of abuse, or evidence of repeated harm. Furthermore, she asserts that "[t]he uncontroverted evidence

13

establishes the child is not afraid of [her] and there are no psychological problems that would impair [her] ability to care for the child," and that she has a support system consisting of her two sisters and a grandmother. Although she acknowledges her history of substance abuse, Mother points out that she "has secured a job, acquired transportation, served all of her time on previous convictions, and she no longer engages in prostitution to support a drug habit."

We first note that evidence supporting endangerment findings under family code section 161.001(1), which Mother does not challenge, can be probative of the section 161.001(2) best interest finding. *See C.H.*, 89 S.W.3d at 28; *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) ("While Appellant's history, admissions, and conduct relating to drug abuse, and her inability to maintain a lifestyle free from arrests and incarcerations[,] support the jury's endangerment finding, this evidence is also relevant to a best interest determination."). Furthermore, a parent's inability to provide adequate care for the child, her lack of parenting skills, her exercise of poor judgment, and her repeated instances of immoral conduct may also be considered when looking at best interest. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.).

Mother argues that the evidence here parallels cases in which courts have found insufficient evidence to support a best interest finding, citing *In re J.R.S.*,

14

232 S.W.3d 278 (Tex. App.—Fort Worth 2007, no pet.), *In re W.C.*, 98 S.W.3d 753 (Tex. App.—Fort Worth 2003, no pet.), and *In re K.C.M.*, 4 S.W.3d 392 (Tex. App.—Houston [1st Dist.] 1999, pet. denied), *disapproved of on other grounds by C.H.*, 89 S.W.3d at 26, to support her argument.

However, *J.R.S.* involved a private termination petition brought by a mother and her husband against an incarcerated father serving a sixty-five year sentence for robbery and a life sentence for armed robbery. 232 S.W.3d at 280. This court concluded that the evidence of best interest was factually insufficient because there was no evidence of the children's desires, their emotional and physical needs, the emotional and physical dangers to the children, the mother and her husband's parental abilities or programs to assist promoting the children's best interest, their plans for the children, the stability of their home, or how the father's incarceration had any effect on the children or their best interests. *Id.* at 284.

Likewise, in *W.C.*, we held that the evidence on the best interest finding was factually insufficient because, among other things, the mother fully complied with her service plan in all respects except for her court-ordered child support payments, and all of her drug tests were negative. 98 S.W.3d at 765. This court stated that while there was evidence of past poor parenting skills, poor decision making, and inadequate protection of the children, because the

15

mother did everything she had been asked to do and because no significant event occurred between the time the Department planned to return the children to her and the termination trial, the evidence to support the best interest finding was factually insufficient. *Id.* at 766.

And in *K.C.M.*—the most factually similar to this case in that the mother used drugs while pregnant and, after the child was born, used cocaine on a daily basis and financed her drug use through prostitution—the court held that the evidence was factually insufficient when the mother performed her service plan while in prison (participating in Alcoholics Anonymous, a parenting program, GED courses, and other self-improvement activities), had been drug-free and sober for the ten months prior to the termination trial, and the child's attorney ad litem fervently argued that jail had turned the mother's life around. 4 S.W.3d at 396–99.

In contrast, here, the record reflects that although Michael was too young to express his own desires, he was born positive for cocaine. Mother, an admitted cocaine addict, was discharged from a drug treatment program after his birth because of her failure to participate in the program, and she tested positive for cocaine during the month of the termination trial. She also failed to complete her parenting classes. Mother testified about nebulous plans to "keep on doing positive things" but provided no concrete testimony about how

16

she would provide for Michael's emotional and physical needs or his safety.[8]

Although she testified that she had a car, she also testified that she drove without insurance and said, "Okay," when asked whether she knew that was against the law. Scott, the CPS caseworker, testified that Michael's foster mother had a good, safe, and stable home, that she had expressed an interest in adopting him, and that he was thriving with his foster mother.

Although some of the testimony given by Mother and her CPS caseworker conflicted—specifically, Mother's ability to financially support Michael—in light of Mother's history of dishonesty, which had resulted in both of her sisters

---

[8] Mother gave the following testimony:

Q.    How are you going to provide shelter for [Michael]?

A.    When I'll be able to get an apartment. Like I said, it's hard for me to get an apartment. But if my sister will be approved, I'll be able to provide shelter and provide Pampers and provide milk and do—everything this lady is taking care of, now I'll be able to do. Just because I'm down and out don't mean I ain't capable of taking care of my own son. I am.

Q.    Well, based on your testimony, you don't even really have a place to stay on your own with [Michael].

A.    Okay. I can go to my grandma's house. . . . She has no criminal background.

Mother testified that she would give CPS her grandmother's name for a home study "right now[,] if you want to, if you'll let me."

having criminal records based on Mother's arrests, and giving due deference to the trial court's finding, we conclude that based on the entire record, the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights to Michael would be in Michael's best interest. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28. Therefore, we overrule Mother's sole issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, WALKER, and MEIER, JJ.

DELIVERED: February 18, 2010