# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00766-CV

**Shavon Middleton, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
## NO. FM-301910, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Shavon Middleton appeals the termination of her parental rights to her three children, R.C.W., R.W., and Q.H. She raises three points of error, arguing that (1) she was deprived of the effective assistance of counsel during the termination proceedings, (2) the evidence was factually insufficient to support termination of her parental rights, and (3) institutional racism in the child welfare system of Texas violated her civil rights. We will affirm the judgment of the district court.

## BACKGROUND

Middleton is the natural mother of twin boys, R.C.W. and R.W., and their younger sister, Q.H. In January 2003, the Texas Department of Protective and Regulatory Services (the

Department) received a referral alleging physical abuse of all three children. The Department investigated and generated a child safety plan, under which Middleton agreed to no longer use physical discipline and to participate in services to help with her parenting and anger issues. In March 2003, the Department received another referral alleging constant abuse of all three children. It again investigated, removed all three children from Middleton's care, and filed its original petition to terminate her parental rights.

On December 10, 2003, the court terminated Middleton's parental rights. The court found by clear and convincing evidence that the Department made all reasonable efforts consistent with time and circumstances to reunite the children with the family, that Middleton knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West 2002). The court further found by clear and convincing evidence that it is in the best interests of the children to terminate the parent-child relationship. *See id.* § 161.001(2).

## DISCUSSION

Middleton raises three points on appeal, arguing that she was deprived of effective assistance of counsel, that the evidence is factually insufficient to support the termination of her parental rights, and that institutional racism within Texas's child welfare system violated her civil rights. We will address each point in turn.

**Ineffective Assistance of Counsel**

Middleton first argues that she was deprived of effective assistance of counsel. Middleton alternatively asserts, first, that her trial counsel's representation was presumptively ineffective because counsel was effectively inert and, second, that she was prejudiced by counsel's deficient performance in failing to use dilatory tactics, address relative placements or obtain a jury trial, by counsel's "other omissions," and by the totality of the circumstances.[1]

In Texas, indigent parents in termination proceedings have a statutory right to counsel. Tex. Fam. Code Ann. § 107.013 (a)(1) (West Supp. 2004-05); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003). Because it would be a useless gesture to recognize the importance of counsel in

---

[1] Specifically, in arguing that counsel was inert and that she was prejudiced by the totality of the circumstances, Middleton cites the following failings of her attorney: failure to assert affirmative defenses in the original answer to the Department's Suit Affecting the Parent-Child Relationship (SAPCR); failure to move for a new trial and preserve a factual sufficiency challenge; failure to assert institutional racism, Thirteenth Amendment, or Fourteenth Amendment-based counterclaims; failure to except to the generality of the original SAPCR pleading; failure to file a motion to strike an affidavit containing hearsay and misleading information or request mediation; failure to request additional discovery of medical or school records, to procure independent psychological or drug evaluations of her client, to request African-American service providers, to request additional or independent home studies of relatives, or to object to the rejection of Tamecia Middleton and Paula Middleton as placements; failure to "shift litigation strategies" upon the Department's permanency plan's change from family reunification to adoption; failure to file motions for summary judgment; failure to procure experts regarding Middleton's sickle-cell anemia or the alleged institutionalized racial and cultural bias of the Department; failure to quash Department subpoenas; failure to request a jury trial to balance the fact that the Department's witnesses would likely be predominately Caucasian against the likelihood of a partly African-American or Hispanic jury pool; failure to present "any real amount of evidence" as measured by comparing numbers of pages of testimony for each side; failure to call the authors of a home study admitted into evidence or elicit testimony regarding Tamecia Middleton's ability or willingness to care for the children if Middleton's rights were terminated; failure to effectively examine Middleton to humanize her; failure to cross-examine and impeach an adverse witness; and agreeing to set trial for November 2003 when the court offered dates in February 2004.

termination proceedings by statute but not to require that counsel perform effectively, this statutory right embodies the right to *effective* assistance of counsel. *M.S.*, 115 S.W.3d at 544. To determine whether parents in termination proceedings received effective assistance of counsel, Texas courts apply the two-pronged standard set by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *M.S.*, 115 S.W.3d at 544-45. To satisfy the *Strickland* standard, Middleton must show both (1) that her attorney's performance was so deficient and contained such serious errors that the attorney was not functioning as counsel, and (2) that the deficient performance prejudiced her defense to such a degree that she was deprived of a fair trial. *Strickland*, 466 U.S. at 687. Any allegation of ineffectiveness must be firmly founded in the record. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.—Austin 2000, no pet.).

*Constructive Denial of Counsel*

Middleton asserts that she was constructively denied counsel because her counsel was inert. An appellant alleging ineffective assistance of counsel need not prove prejudice in cases in which counsel entirely fails to subject the opposition's case to meaningful adversarial testing. *United States v. Cronic*, 466 U.S. 648, 658-59 (1984); *Childress v. Johnson*, 103 F.3d 1221, 1228 (5th Cir. 1997). If an appellant can establish that counsel was "not merely incompetent, but inert, prejudice will be presumed." *Childress*, 103 F.3d at 1228. However, "'bad lawyering, regardless of *how* bad, does not support the . . . presumption of prejudice' under *Cronic*." *Id*. at 1229 (citing *McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990)) (emphasis in original). Thus, if Middleton can show that counsel was inert, she need not also show that she was prejudiced by counsel's errors.

4

The record shows that Middleton's counsel was not inert; rather, she subjected the Department's case to meaningful adversarial testing. In counsel's short opening statement, she alerted the court to the Department's heavy burden and predicted that the evidence would show that Middleton had learned from her mistakes and that termination was not in the children's best interests. Counsel cross-examined witnesses for the Department and for the children, emphasizing the limitations of the witnesses' knowledge or contact with the family and eliciting other testimony beneficial to Middleton's case,[2] and objected to the admission of adverse evidence. In presenting Middleton's case, counsel called Middleton and her sister, Tamecia Middleton.[3] Both testified about the children's needs and Middleton's abilities to properly care for them. In her closing statement, counsel directed the court's attention to positive precedent from this Court, emphasized the progress Middleton had made participating in services and her intentions regarding the children in the future, evaluated and reviewed adverse evidence and testimony, and reminded the court of the constitutional rights of parents. Counsel's performance was far from the "inert" behavior of the attorney in *Childress*, whose sole function was to stand beside the defendant and execute a waiver of his right to a jury trial, and who the Fifth Circuit's opinion twice compared to a potted plant. *See Childress*,

---

[2] For instance, counsel elicited testimony regarding Middleton's improvement in various areas and participation in services; explanations of Middleton's behavior, plans to care for the children, and family support; the children's requests to go home with Middleton and their bond with her and each other; and visitation recommendations the Department did not follow.

[3] Although counsel failed to elicit testimony on cross-examination of Middleton's neighbor, Roslyn Brady, that Brady had left her own infant child in Middleton's care after making allegations of abuse against her, both Middleton and her sister, Tamecia Middleton, testified to this fact during the presentation of Middleton's case.

103 F.3d at 1223, 1226, 1231. Because Middleton has not shown she was constructively denied counsel, we may not presume prejudice.

*Ineffective Assistance:  Dilatory Tactics*

Middleton next argues that she was prejudiced by her counsel's error in failing to use dilatory tactics to give her more time to improve her parenting abilities.  We first note that the legislature has mandated a definite period within which termination proceedings must be resolved. Trial courts must either terminate parental rights within one year of the date the Department is appointed temporary managing conservator of a child or dismiss the case.  Tex. Fam. Code Ann. § 263.401(a) (West 2002).  The court may retain the suit and extend the deadline up to six months if doing so is in the child's best interest. *Id*. § 263.401(b).  Middleton's children were removed eight months before this disposition.  The question before us therefore becomes whether effective counsel must in all cases employ dilatory tactics to use each day of the maximum time period allowed by law, that is, whether Middleton's counsel should have delayed the case for four more months or ten more months in the event the court had retained the suit and extended the deadline in the children's best interests.  *See id.*, §§ 263.401(a), (b).

To satisfy the first prong of *Strickland*, Middleton must prove by a preponderance of the evidence that her counsel's performance fell below an objective standard of reasonableness as defined by prevailing professional norms.  *Strickland*, 466 U.S. at 687-88.  In determining whether counsel's performance was deficient, we apply a strong presumption that her conduct was within the range of reasonable professional assistance.  *Thompson*, 9 S.W.3d at 814; *Blevins*, 18 S.W.3d at 271. As stated in *Strickland*, "A fair assessment of attorney performance requires that every effort be

6

made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time . . . ." 466 U.S. at 689. The appellant bears the heavy burden of overcoming this presumption. *Thompson,* 9 S.W.3d at 814; *Blevins*, 18 S.W.3d at 271. "This burden requires the [appellant] to bring forward a record from which we may discern that trial counsel's performance was not based on sound strategy." *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.). If the record is silent as to why counsel made a particular decision, it is "insufficient to overcome the presumption that counsel's actions were part of a strategic plan." *Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000) (citing *Thompson*, 9 S.W.3d at 814).

Texas has not enacted specific guidelines for attorneys in termination cases, but Middleton refers us to a handbook on representing parents in termination cases,[4] standards used in other states,[5] and guidelines for attorneys ad litem representing *children* in termination cases.[6] She argues that counsel should have delayed the case as long as possible. Middleton asks us to rule that

---

[4] Bree Buchanan, *Representing Parents in Termination of Parental Rights Cases* (1998). We note that the practical advice in such handbooks is not authoritative or binding upon this Court. Furthermore, much of the advice is clearly precatory; for example, the handbook advises the lawyer to ease the client's pain by encouraging the client to write to current caregivers to communicate what the children were like as babies, their favorite foods, songs, etc. *Id*. at 9. We will consider such advice only as it is persuasive on the issue of proper representation.

[5] Philadelphia County, Pa., 32 Pa.B. 4033, Rules 1702-05 (2002) (to ensure competent and effective counsel in Dependent Court for Philadelphia parents and children); Maine Court Improvement Project, *Representing Parents in Child Protection Cases: A Basic Handbook for Lawyers* (1999).

[6] Am. Bar Ass'n, *Standards of Practice for Lawyers Who Represent Children in Abuse and Neglect Cases* B-1(4) (2003); Nat'l Ass'n of Counsel for Children, *NACC Recommendations for Representation of Children in Abuse and Neglect Cases* (2001).

any attorney representing a parent in a case in which the Department is aggressively pursuing termination must use the full statutory period to the client's advantage. However, none of the sources Middleton cites states that dilatory tactics are an integral part of objectively reasonable representation in termination cases.[7] *See Strickland*, 466 U.S. at 687-88.

Middleton next turns to guidelines recommending that attorneys ad litem for children in termination cases expedite the cases. *See* Tex. Fam. Code Ann. § 107.003(1)(E) (West Supp. 2004-05); Am. Bar Ass'n, *Standards of Practice for Lawyers Who Represent Children in Abuse and Neglect Cases* B-1(4) (2003). She argues that, where the parent and child are legally opposed to one another, the parent's attorney should do the converse of what the child's attorney should do: delay proceedings as much as possible. Middleton reasons that this would improve the parent's chances to show progress in areas of concern because, given more time to make use of services, a parent would perform better. The appeal of congruence notwithstanding, it is not necessarily sound trial strategy for the parent's attorney to oppose the child's attorney at every turn. Parents' attorneys need not use the full statutory period in order to effectively represent their clients; there is no such duty under the law. In some cases, doing so would actually disadvantage the client. The attorney must weigh the risk that a continued deficiency in performance despite having additional time would

---

[7] The Buchanan handbook's suggestion that, if a case goes to mediation, counsel should consider negotiating for more time to complete services is a far cry from stating that any competent attorney must extend proceedings for a year or more. Buchanan, *supra* note 6, at 8. Similarly, the Philadelphia Rules do not advocate use of dilatory tactics by parents' attorneys. *See generally* Philadelphia County, Pa., 32 Pa.B. 4033, Rules 1702-05 (2002). The Maine handbook actually suggests that parents' attorneys avoid duplication and use documents instead of testimony to reduce trial time and "manage the case for efficiency." Maine Court Improvement Project, *Representing Parents in Child Protection Cases: A Basic Handbook for Lawyers* § IV (1999).

prejudice the client's case. For example, here, although the record shows that Middleton had made some improvement in safe parenting, there was also evidence that her progress was minimal. Middleton has not demonstrated that, given more time, her performance would have improved, and it is possible that it could have worsened. She therefore fails to overcome the strong presumption that counsel's conduct was within the range of reasonable professional assistance. *See Thompson,* 9 S.W.3d at 814; *Blevins*, 18 S.W.3d at 271.

### *Ineffective Assistance: Relative Placements*

Middleton argues that her counsel's conduct fell below an objective standard of reasonableness because counsel did not adequately address relative placements for the children. It is true that the record does not show that Middleton's attorney forwarded information to the Department regarding possible relative placements, conducted her own investigation, or requested additional home studies as recommended in the referenced handbook. Bree Buchanan, *Representing Parents in Termination of Parental Rights Cases* 8 (1998). The record does show, however, that the Department had already conducted two relative home studies, that it articulated plausible concerns about the children's safety in each home, and that Middleton refused to cooperate in suggesting more names of relatives for review. We do not agree that counsel's failure to request additional relative home studies which, on the limited record here, she might have deemed futile or even against her client's wishes, could not have constituted sound strategy. *See Mayhue*, 969 S.W.2d at 511. It is Middleton's burden to show that counsel should have produced more studies or that her failure to do so was erroneous. *See id*. Our standards of reasonableness do not require an appointed attorney to oppose her client and attempt useless acts. Again, Middleton has failed to overcome the strong

9

presumption that counsel's conduct was within the range of reasonable professional assistance. *See Thompson*, 9 S.W.3d at 814; *Blevins*, 18 S.W.3d at 271.

## Ineffective Assistance: Jury Trial

Reasonably competent counsel, Middleton claims, would have requested a jury trial to give Middleton peer support, as a significant percentage of potential Travis County jurors are African-American or Hispanic, and because the jury's presence would have made counsel more vigilant in objecting to inadmissible evidence and requesting instructions to disregard. She alleges that she was prejudiced in that she was denied the chance to have her case decided by a more sympathetic fact-finder without the consideration of inadmissible harmful evidence.[8] We have no record on which to determine that counsel's decision to waive a jury trial was not based on sound strategy. *See Mayhue*, 969 S.W.2d at 511. Middleton has not overcome the presumption that counsel's performance met an objective standard of reasonableness or shown that failure to request a jury trial constituted ineffective assistance of counsel. *See Strickland*, 466 U.S. at 688.

## Ineffective Assistance: "Other Omissions" and Totality of the Circumstances

Middleton argues that, because counsel did not introduce the children's medical records into evidence, the court was unaware that she provided them adequate medical attention and

---

[8] Middleton would have us assume that counsel would have behaved differently before a jury, that African-American or Hispanic jurors would have been empaneled, that they would have been more sympathetic to Middleton concerning the severe abuse of her three African-American children, and that their sympathy would have been enough to change the outcome of the trial. *See Strickland*, 466 U.S. at 694 (requiring appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

10

that she had no opportunity to treat their mental disorders or developmental delay. Again, we have no record to show that this was not a conscious decision based on sound strategy, in part because we do not know that the information contained in the medical records would have aided Middleton's case. *See Mayhue*, 969 S.W.2d at 511.

Reasonably competent counsel, according to Middleton, would have more effectively cross-examined witnesses and shown Middleton's parenting in a better light. Specifically, Middleton argues that counsel would have made the court aware of Middleton's own medical condition, her providing medical care for the children, ensuring their attendance at school, and expressing concern with their behavior at school. Each of these facts, however, can be gleaned from the testimony and exhibits admitted at trial. The trial court was aware of them. Although we cannot say that no attorney could have outdone Middleton's counsel in re-emphasizing these specifics or in painting a more attractive picture of her client, neither can we say that counsel's failure to convince the court on these matters was deficient. Failure to conduct "more effective" cross-examination to reinforce facts already before the court is not such a serious error that the attorney was not functioning as counsel. *See Strickland*, 466 U.S. at 687.

The "totality of the circumstances" argument posits that the cumulative actions and omissions of counsel constitute prejudicial ineffectiveness even if no single act or omission would suffice. Although "we must take into account all of the circumstances surrounding the case" and "primarily focus on whether counsel performed in a 'reasonably effective' manner," in doing so we give great deference to counsel's performance, indulging the strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *In re M.S.*, 115

11

S.W.3d at 545. Here there is no indication in the record that Middleton's counsel was not reasonably effective or that her cumulative actions and omissions prejudiced Middleton. We therefore hold that Middleton has not shown that she was prejudiced by counsel's "other omissions" or the totality of the circumstances.

Middleton's counsel was not inert, and Middleton has not carried her burden of showing that counsel was deficient in failing to use dilatory tactics, address relative placements or obtain a jury trial, in counsel's "other omissions," or in the totality of the circumstances. She has also not shown that she was prejudiced by any such deficiency. We overrule Middleton's first point of error.

**Factual Sufficiency**

Middleton contends that the evidence was factually insufficient to support the trial court's finding that termination was in the children's best interest or to overcome the presumption that the children should be placed with relatives. Middleton admits in her brief that she has not preserved the question of factual sufficiency by timely filing a motion for new trial, which is a prerequisite to presenting such a complaint on appeal. *See* Tex. R. Civ. P. 324(b)(2); Tex. R. App. P. 33.1(a). However, in cases in which the appellant also claims she was denied ineffective assistance of counsel, we may consider factual insufficiency in conjunction with the ineffective assistance claim although the argument is not properly preserved. *See M.S.*, 115 S.W.3d at 549-50. We consider this issue in conjunction with the ineffective assistance of counsel claim. *Id.* at 538.

Parental rights are of constitutional magnitude, but they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). It is imperative for courts to recognize the constitutional

12

underpinnings of the parent-child relationship, but it is also essential that the emotional and physical interests of a child not be sacrificed to preserve that right. *Id*. To terminate a parent's rights to her children, the Department must prove and the trial court must find by clear and convincing evidence both of the following statutory requirements: (1) that the parent has engaged in conduct set out as statutory grounds for termination and (2) that termination is in the children's best interests. Tex. Fam. Code Ann. § 161.001 (West 2002). Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief or conviction of the truth of the allegations sought to be established. *C.H.*, 89 S.W.3d at 23 (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). This heightened standard of proof is appropriate because termination is a drastic remedy of such weight and gravity that due process requires the State to justify termination of the parent-child relationship by more substantial proof than a preponderance of the evidence. *Id*. (citing *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)); *see also Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) (requiring that in termination cases "the State support its allegations by at least clear and convincing evidence").

In determining whether evidence is factually sufficient to support a best interest finding, we give due consideration to evidence that the fact-finder could have found to be clear and convincing and consider whether disputed evidence is such that a reasonable fact-finder could not have resolved the dispute in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Factors courts consider in determining the best interests of a child include the child's desires, the present and future emotional and physical needs of and danger to the child, the parenting abilities of the parent, the programs available to assist her, the plans for the child by the parent or agency

seeking custody, the stability of the home or placement, any acts or omissions of the parent that may indicate that the parent-child relationship is improper, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, and a fact-finder is not required to consider all the listed factors in making the best interest determination. *Id*. at 372. The test focuses on the best interest of the child, not the needs or desires of the parent. *See In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.).

The court heard evidence that Middleton severely physically abused her children. Middleton admitted that she strikes her children, has left marks on at least one of the boys from disciplining him with a belt, and has difficulty managing her anger and sometimes yells, threatens, curses, and hits when angry. Middleton testified that she still believes in physical discipline but will never hit her children again. Although Middleton characterized her physical discipline of the children as appropriate[9] and measured,[10] the court heard contrary evidence from other sources.

The court admitted reports and an affidavit from Angela Pratt, the CPS Specialist assigned to the case, that recited months of observed abuse. In December 2002, the Department documented reports from R.C.W. that Middleton hit him with her hands and a belt for getting a "sad

---

[9] Child Protective Services (CPS) Caseworker Angela Pratt testified that the Department considers "reasonable physical discipline" to include striking the buttocks with a hand or another appropriate object, not including implements such as extension cords or wire hangers, and not leaving any marks or bruises on the child.

[10] Dr. David Poole, a psychologist who evaluated Middleton and the twins, testified that she admitted having bruised R.C.W. but that she generally characterized her physical discipline of the children as measured. However, he believed that the twins' preoccupation with violence, anger, loss of control, conflict and fighting and their surges of anxiety and aggression were consistent with repeated exposure to volatility and overreactions far in excess of anything necessary for discipline or control.

face" at school; Pratt observed a belt buckle imprint on his abdomen, a black eye, multiple lacerations and bruises on both palms, red streaked areas to both inner forearms, old bruises on his shoulder, and marks that appeared to be healing cigarette burns on his forearms. R.W. reported he had heard R.C.W. crying and telling Middleton to stop; at that time neither R.W. nor Q.H. bore marks of physical injury. The Department found "reason to believe" physical abuse had occurred in that case.[11] Although Middleton indicated she understood proper physical discipline of children and agreed not to leave marks, in January 2003 the Department received reports that Middleton had thrown R.C.W. onto a bedroom floor and had punched all three children in the face and choked them; they all had been observed with busted lips and bruises. The following day Pratt visited R.C.W. and R.W. at school and observed an eye injury, bruises, and scarring on R.W. and an injured lip and bloody nose on R.C.W. R.W. refused to speak,[12] but R.C.W. said Middleton struck him with a belt and buckle, slammed him into the floor, choked him, gave him a black eye, slaps all the children in the face, and once somehow caused Q.H.'s elbows to bleed. When Pratt took R.C.W. home, Middleton admitted having physically disciplined him the day before for misbehaving at

---

[11] The Department must make investigations of allegations of abuse or neglect, which culminate in written reports used to help determine the Department's next step. Tex. Fam. Code Ann. § 261.301-12 (West 2002). If it determines that abuse or neglect has occurred, the case disposition is "reason to believe," and the Department must assess the likelihood of future abuse or neglect and provide child protective services if necessary. 40 Tex. Admin. Code §§ 700.511, .514 (2004).

[12] Eventually, during his interview, R.W. said that his eye was red and swollen because he had poked it.

15

school and stated that if her children continued to misbehave, she would continue to do so.[13]

Middleton denied having any knowledge of how R.C.W.'s face was bloodied.[14]

In March, Pratt received another report that Middleton was constantly beating all three children, that R.W. had required staples in the back of his head because she had slammed him into a door,[15] that Middleton's boyfriend and sister had each had to intervene to stop her from hurting the children, and that she had beaten R.W. with a broomstick so severely that he had lost control of his bowels. In her testimony before the court, Pratt reiterated her descriptions of the children's injuries and added that R.C.W. had been observed with welts on the hips and buttocks and a mouth injury. Pratt testified that the twins were afraid to attend Middleton's first visit with them after their removal and expressed concerns that she would retaliate if they told Department workers about the abuse.

Roslyn Brady, Middleton's neighbor, testified that she saw Middleton hit the children on multiple occasions after the Department's involvement had begun. She testified that when Middleton beat R.C.W. so badly that he "messed on his self," Middleton then picked him up by the throat, threw him to the ground, and made his twin clean him. Brady testified that Middleton's

---

[13] Middleton agreed to a safety plan that prohibited physical discipline but stated that she didn't think it was going to work and that if she couldn't strike her children, she would refuse to discipline them at all.

[14] Pratt also interviewed school officials. The assistant principal described R.C.W.'s uncontrollable outbursts and fear of going home when in trouble at school and confirmed that she had seen him with a black eye and busted lip. His kindergarten teacher confirmed that he was afraid to go home and that he had a busted lip but did not know how it had happened.

[15] When another CPS caseworker had made a home visit, R.W. had claimed that his head injury came from his three-year-old sister pushing him down stairs, that Middleton hits him on the backside with a belt and in the face, nose, and mouth with her hand, and that he was afraid of her.

16

boyfriend, sister Laticia, and daughter Q.H., observed incidents of abuse of the twins.[16]  Although Middleton had ceased abusing the children for extended periods of time, Brady testified that Middleton always began again and that Brady feared they were in danger of serious injury.

Tamecia Middleton, Middleton's sister, testified that, in the past, she had been concerned about Middleton's abuse of the children and that she was called to Middleton's home to stop her from hitting them with a broom.  Although Tamecia Middleton never personally witnessed the abuse, she said she was aware Middleton was using physical discipline on the children regularly.

Since the children's removal, additional evidence of abuse has surfaced.  The children's court-appointed special advocate (CASA), Rene Franklin, testified that all three children claimed Middleton struck them on multiple occasions and that she used a belt and a broom.  A CASA supervisor, Kyla McCulley, testified that, while supervising visitation, she saw Q.H. hit dolls together because "they were fighting" and tell Middleton, "Mama, this is you.  You beat us."  Q.H. continued to insist that the dolls were fighting, although her grandmother suggested that the dolls were friends.  Denise Lozano, the children's therapeutic foster mother, testified that when the children came to her in March, they were extremely aggressive and violent and that they required almost constant supervision to prevent them from hurting each other.  When the children get out of

---

[16]  Physical abuse of other children committed in a child's presence may endanger the observing child's physical and emotional well-being and constitute endangerment.  *See Stuart v. Tarrant County Child Welfare Unit*, 677 S.W.2d 273, 278-79 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) (holding evidence that younger sister died from chronic abuse and neglect was sufficient to uphold termination of parents' rights to brother without evidence of physical abuse of brother) *overruled on other grounds by In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).  It is reasonable for a trial court to conclude that leaving a child with parents who have shown they are capable of abusing and neglecting children would endanger that child's emotional and physical well-being.  *Id*. at 280.

control, she physically holds them in "time out" until they can calm down. For some time, they exhibited strong fears when being held in time out and would kick, scream, and bite. Lozano believed they were expecting to be struck. Dr. Poole's psychological reports on R.C.W. and R.W. stated that both suffered emotional and behavioral disruption and trauma symptoms that were consistent with their reports of severe physical abuse.

The evidence is such that the court could reasonably have formed a firm belief or conviction that Middleton has exhibited a pattern of physically abusing all three children and may be likely to continue to do so in the future, even after periods of refraining from abuse or representations that she would not strike the children. Furthermore, Michael Martinez, a CPS specialist who reviews files for progress, testified that he sees a continued risk of physical abuse if the children are returned to Middleton and that they have been endangered by exposure to physical abuse.

The court also heard evidence that Middleton has not made enough progress to enable her to parent properly. Middleton testified that, despite her anger issues in the past, she is better able to control herself now. Although she believes in physical discipline, she testified that parenting classes have taught her to use "time out" or to take toys from her children to discipline them. However, Middleton also admitted in her testimony that she loses her temper even when she knows that doing so is not helpful[17] and that she has not completed her anger management classes. Diana

_____

[17] For example, when her children were removed, Middleton cursed Department workers and called them names. She testified that she made repetitive harassing phone calls and threatened to put her caseworker in a wood chipper. Middleton said she knew her behavior would hurt her case, but she was out of control. She explained that she was hostile toward caseworkers because she did not like their attitudes and because the Department did not allow Middleton to bring family members

18

Escamilla, the program director of Adelante Counseling and Middleton's anger management class provider, testified that, although Middleton had attended four of seven scheduled group classes, after the first two classes, "there were already concerns" about her progress.[18] According to Adelante Counseling Services notes, Middleton disrupted group meetings, cursed and displayed a confrontational, negative attitude, and stated that the classes were useless and that she had a right to hit her children. At the time of trial, Escamilla recommended seventeen more sessions of individual anger management therapy because she and Middleton agreed that Middleton "wasn't getting anything out of" the classes. Escamilla assessed Middleton's level of dangerousness as "moderate."

Kelley Broadaway, Middleton's protective parenting teacher, testified that Middleton successfully completed her parenting program, but had been hostile, angry, and disruptive in class. Although Middleton took responsibility for some of the children's injuries and expressed remorse, Broadaway recommended that Middleton continue anger management. Broadaway testified that she worried about Middleton's temper with the children because she had lost her temper in class and Broadaway felt that rage could erupt at any time. Protective parenting classes do not, in Broadaway's opinion, address or cure rage issues.

to visits or increase their frequency and that she made the twelve or more harassing phone calls and the threat because the Department did not place her children with her sister.

[18] Middleton testified that she was expelled from one anger management class for being late and for excessive absences due to her incarceration for cocaine-related charges. CPS Specialist Michael Martinez testified that, after failing to attend Department-sponsored anger management classes, Middleton located and enrolled herself in anger management classes with the Adelante counseling service discussed in this opinion.

19

Jude Wick, Middleton's therapist, testified that Middleton's therapy focused on her angry feelings and finding alternative behaviors. Wick testified that Middleton did not make progress in recognizing or dealing constructively with her anger. She refused to consider medicating herself or her children because she did not believe in it.[19] Wick also testified that Middleton did not express worry for her children, have plans or goals for their return, or refer to them by name, which he believed indicated that she was not focused on their needs. Poole testified that he believed Middleton was intellectually able to integrate new information into her life but that her anxiety and trust issues left her at a high risk of repeating abusive behaviors. Poole did not recommend medicating Middleton against her will, although he believed she was depressed. He recommended parenting and anger management classes but felt that individual therapy was not likely to succeed because Middleton was oppositional, defensive, and in denial. Poole believed that if the children were returned to Middleton, the danger to them would likely re-emerge because of her continuing difficulty controlling her anger. Martinez observed Middleton lose her temper on several occasions during the Department's involvement and testified that he recommends more anger management, individual therapy, parenting classes, and a drug and alcohol assessment because of Middleton's recent arrest for cocaine-related charges. Martinez testified that in eight months, Middleton made no improvement and recently told him she did not have a problem or need to participate in the services offered. He believed that the children would be in physical danger if they were returned to

---

[19] The children's foster mother testified that the boys are now medicated for anxiety disorder.

Middleton because she was angry, very reactive, and unable to express her feelings without hurting them.

Moreover, evidence shows that the children have a particularly strong need for a calm and stable environment. Michael Greenwood, the treating therapist for all three children, testified that, as compared with other children, they have more intense anger and more extreme tantrums with incessant crying. CASA Rene Franklin concurred that the children are developmentally off-target and have anger issues. Greenwood described them as "in a great deal of distress" and noted that all three, especially Q.H., require considerable attention, stability, and constant supervision in an environment like their therapeutic foster home. Greenwood testified that changes in their environment, such as going to school, are unusually difficult for the siblings, and that he comes to their foster home for therapy sessions because taking them to therapy was unduly disruptive. Greenwood opined that, for these three children, any physical discipline at all would be detrimental. Poole testified that the twins suffer from surges of anxiety and anger and from post traumatic stress disorder.[20] He believed that they could recover if given a calm environment in which they were convinced that adults are safe, mean what they say, and are reliable, and that nobody will hurt or scare them. Poole agreed that any physical discipline of the twins would merely cause an anxiety spike and that they would not learn anything from the discipline.[21] Stability, Poole opined, is a

---

[20] Poole testified that post traumatic stress disorder can cause children to become incapable of handling any sort of stress and often to go to unhealthy lengths to avoid it.

[21] Poole also testified that, while playing basketball, R.W. experienced anxiety from physical impact that resulted in a dissociative episode; after a basketball fell on the top of his head, he became quiet, still, and nonresponsive for a few moments as if dazed. Poole testified that R.W. had "checked out emotionally" as a survival mechanism.

paramount consideration for R.C.W. and R.W. because they react so strongly to tumult, become angry, and act out aggressively. Martinez also testified that the children need nurturing, structure, stability, and a regular routine. He believed that Middleton is unable to provide for these needs because she does not have a stable life and is not nurturing; the children have to seek her out for attention.

There is evidence that the children do not feel safe and secure with Middleton. Pratt testified that all the children feared Middleton, that the twins were both too afraid to go to their first visit with her, and that R.W. was too afraid to attend supervised visitation on other occasions. Greenwood, Franklin, and Lozano all testified that, after Middleton told the children she was going to court so that she could bring them home with her, R.C.W. began screaming, and the next day he became so depressed and non-responsive at school that he was sent home. According to Franklin, R.C.W. has missed four and R.W. has missed about ten of Middleton's twenty-three visits, and the children appeared to be afraid of Middleton during the visits.[22] Franklin testified that the visits had an adverse effect on the children's tantrums and crying. Martinez testified that the Department did not increase visitation after Middleton completed her parenting class and suspended visitation during trial because she had used the visits to discuss her case with workers, her anger was escalating, and there were concerns that she would behave inappropriately during visits.[23]

_____

[22] For instance, on one visit, when R.C.W. went out of turn in a game and Middleton tapped him on the head, Franklin testified that he became quite fearful and markedly subdued.

[23] Franklin testified that during the early visits, Middleton took cell phone calls and did not show affection, and Martinez testified that, when Middleton was prevented from bringing her boyfriend to a visit with the children, she stayed in his office, screaming, and arguing, rather than joining the children, even after she was warned that her hour with them was expiring. He testified that she attended the second half of the visit, where she exhibited anger and belittled the children's

22

This abuse indicates that the existing parent-child relationship is not a proper one and reflects poorly on Middleton's abilities to parent and meet the children's needs. There was also evidence that Middleton has been unable to use the available services to improve her parenting abilities or curb her angry outbursts, which raises concerns about the present and future physical and emotional danger to the children if returned to their mother.[24]

Middleton also challenges the Department's failure to place the children with relatives. The Department performed home studies in an attempt to place the children with Middleton's sister, Tamecia Middleton, or her aunt, Paula Middleton. Middleton now argues that there was not sufficient evidence to overcome the strong presumption that placement with Tamecia

---

clothing and hair, which Middleton characterizes as reminding her children of their heritage and admonishing them to take proper care of their hair because none of the people around them had hair like theirs.

[24] In arguing that her counsel was ineffective, Middleton argues that effective counsel would have drawn compellingly persuasive parallels between her case and a Fort Worth Court of Appeals case that hinged on the best interest question. *See In re W.C.*, 98 S.W.3d 753 (Tex. App.—Fort Worth 2003, no pet.). It is true that in both cases, the ground for termination was endangerment; in *W.C.* the primary danger to the children came from the mother's relationships with abusers and trouble supervising the children alone. *Id.* at 758, 761. She herself did not hurt the children and may not have known about the abuse. *Id.* at 760-62. The court said, "this case is one in which appellant's offending behavior is not egregious enough, on its own, to warrant a finding that termination is in the children's best interest." *Id.* at 766. In contrast, the danger to R.W., R.C.W., and Q.H. comes from Middleton's own abusive behavior. Further, in *W.C.*, the mother expressed extreme remorse, accepted responsibility for the abuse, and made marked improvements in her ability to control and express anger. *Id.* at 763. However, Middleton's parenting instructor testified that Middleton expressed some remorse and accepted partial responsibility but had not dealt with her rage, and her therapist was concerned she made no progress in dealing with her anger. The mother in *W.C.* did everything the Department required of her except pay child support; the court opined that there was nothing more she could have done to have her children returned to her. *Id.* at 765-66. Middleton did not even comply with the Department's requirement that she stop striking the children through the pendency of the investigation. These cases have very different facts and we cannot determine from the record how counsel could have avoided the alleged error of failing to make them appear similar.

23

Middleton or Paula Middleton was in her children's best interests. Because the family code mandates that children be placed with relatives, "unless placement with the noncustodial parent or relative is not in the best interest of the child," Tex. Fam. Code Ann. § 262.201(e) (West 2002), and because the state's interest favors preservation, not severance, of natural familial bonds, *Rodarte v. Cox,* 828 S.W.2d 65, 79-80 (Tex. App.—Tyler 1991, no writ); *Santosky,* 455 U.S. at 766-67, we address the Department's failure to place the children with Tamecia Middleton or Paula Middleton in our sufficiency review of the best interest determination. *See Holley,* 544 S.W.2d at 371-72 (factors in determining best interest may include stability of proposed home or placement, plans by parent or Department, and possible dangers to child).

Martinez testified that the home study on Tamecia Middleton raised concerns regarding her ability to protect the children from possible future physical abuse by Middleton. Tamecia Middleton testified that she and Middleton had daily contact and that the children would be safe if returned to their mother. Tamecia Middleton admitted having past concerns about Middleton abusing the children but testified that she had never personally witnessed any such abuse, although she had been called to Middleton's home to intervene. The Department expressed concern that Tamecia Middleton did not appear to believe the allegations against her sister, that she was so close to her that they spoke daily, and that she would not refrain from allowing access outside of Department recommendations, possibly re-traumatizing the children.

Martinez also testified that the Department's home study on Paula Middleton raised concerns that she had "too much on her plate" and because of problems with her references. Furthermore, Martinez testified that there were deep concerns that Paula Middleton would not be

24

able to protect the children from their mother or follow the Department's guidelines regarding contact with Middleton. Pratt's report stated that, shortly after the twins' birth and before Q.H. was born, Middleton voluntarily placed them with Paula Middleton when the Department found neglectful supervision by Middleton. Middleton testified that she and the twins lived with Paula Middleton for four months before Middleton moved out, leaving the twins there, because she didn't like Paula Middleton's rules. A month later, Middleton testified, Paula Middleton got a job and dropped the twins off at Middleton's home. Martinez testified that the Department was concerned that Paula Middleton might turn the three children over to Middleton as she had before, despite the risk of physical abuse.

When she was informed that Paula Middleton had not been approved after the second home study, Martinez testified, Middleton flew into a rage and refused to give any other relatives' names for consideration as possible placements for the children. Thus, the Department's plan for the children became adoption as a sibling group. Martinez considered the sibling group adoptable.

The evidence was such that a reasonable fact-finder could have formed a firm belief or conviction that termination was in the children's best interest because of the severe physical abuse and the probability that the physical and emotional danger to the children would recur if Middleton's rights were not terminated. It was therefore factually sufficient to support the finding. *C.H.*, 89 S.W.3d at 18-19. Because the evidence was factually sufficient to support the best interest finding, we hold that, even assuming it was error for counsel to fail to move for a new trial, Middleton cannot prove that she would have had a different outcome absent the alleged error. Middleton has not shown she received ineffective assistance of counsel. *Strickland*, 466 U.S. at 694.

25

### Racial Bias

Middleton argues that, because African-American children are over represented in the child protective system, because caseworkers are more likely to recommend removal of African-American than other children, and because the Adoption and Safe Families Act gives Texas a "bounty" of $4000 per African-American child removed and adopted,[25] the termination of her parental rights violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.[26] Middleton requests that we hold that the child protection system of Texas is facially defective or that it is invidious as applied to her, but, except for presenting statistics on the prevalence of African-American children in various states' child protection systems, she does not specify any facial defect or the alleged invidious application to her. The record shows that she did not present this argument to the trial court.[27] Middleton cannot raise for the first time on appeal a complaint that is not preserved. Tex. R. App. P. 33.1. "Without proper preservation, even

[25] Contrary to Middleton's assertion, eligible states receive payments of "$4,000, multiplied by the amount (if any) by which the number of foster child adoptions in the State during the fiscal year exceeds the base number of foster child adoptions for the State for the fiscal year" for non-special-needs adoptions. 42 U.S.C.A. 673b(d)(1) (West Supp. 2004). This payment is not specific to any race or ethnicity.

[26] Middleton also states that the Department's acts are reminiscent of badges and incidents of slavery prohibited by the Thirteenth Amendment and that its encroachments upon her family constitute an unwarranted exercise of delegated authority prohibited by Article I, Sections 13 and 19 of the Texas Constitution but does not explain how the Department has violated these provisions. U.S. Const. amend. XIII; Tex. Const. art. I §§ 13, 19. If these are appeals of the termination of her rights, they are inadequately briefed and therefore waived. *See* Tex. R. App. P. 38.1(h).

[27] In arguing ineffective assistance of counsel, Middleton contends that counsel's failure to raise racial discrimination illustrated a complete failure to exercise judgment on her behalf. However, she does not show that counsel was effectively inert, that counsel's failure to preserve this issue was deficient performance, or that counsel's failure prejudiced her cause.

constitutional error may be waived." *Harris v. State*, 125 S.W.3d 45, 48 (Tex. App.—Austin 2003, pet. denied) (citing *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000)).  Accordingly, we overrule Middleton's third issue.

## CONCLUSION

Middleton has not shown that she received ineffective assistance of counsel, and the evidence was factually sufficient to support the finding that termination of her parental rights was in her children's best interests.  Her discrimination claim was waived.  We overrule all three points and affirm the judgment of the trial court.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   May 12, 2005