

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00147-CV

IN THE INTEREST OF C.C., A
CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In one issue, Appellant Mother appeals the termination of her parental rights to C.C., complaining that the evidence is factually insufficient to support the trial court's best interest finding.  We affirm.

## II. Factual and Procedural History

Two Child Protective Services (CPS) employees and Mother testified at the termination trial in April 2010.  Mother was incarcerated in state jail at the

---

[1]*See* Tex. R. App. P. 47.4.

time of the trial, and her earliest release date was half a year away, in October 2010. She was also incarcerated at the time she gave birth to C.C., the youngest of her five children.

Mother testified about her other children[2]: Jeremy, age twenty-two, lived with Mother until he was around age fourteen or fifteen. Mother testified that she wrote to Jeremy once a week while he was incarcerated in the Hood County Jail. Darren, age twenty, lived with Mother until he was around twelve years old. He has also been incarcerated. Damon, age fifteen, lived with Mother until he was three years old. Jeffrey, born in 2005, was removed from Mother before his first birthday and lives with one of Mother's sisters. C.C. has never lived with Mother.

Mother's criminal convictions were admitted through the testimony of Christy Shidal, the CPS investigator, set out as follows:

- On December 17, 2001, Mother was convicted of third degree felony injury to a child. After pleading guilty, she received two years' confinement as punishment. The indictment alleged that Mother struck, scratched, and bit Jeremy, who was younger than age fifteen at the time.[3]

- On May 7, 2001, Mother was convicted of misdemeanor assault causing bodily injury to a family member after pleading guilty in exchange for six days in jail.

- On August 21, 2006, Mother was convicted of misdemeanor assault causing bodily injury to a family member after pleading guilty in exchange for forty-five days in jail.

---

[2]We use pseudonyms to protect the children's identities.

[3]Mother testified that she was high on drugs at the time and did not recall biting or fighting him.

- On January 30, 2008, Mother was convicted in two cases of state jail felony fraudulent use or possession of identifying information after pleading guilty in exchange for 200 days' jail time in each case, to be served concurrently.

- On January 21, 2010, Mother made an open plea of guilty to a state jail felony possession of a controlled substance (methamphetamine) charge and made a plea in bar of an unadjudicated 2008 assault causing bodily injury of a family member charge. She received three years' confinement as punishment.

Some of Mother's CPS history involving her other children was admitted through the testimony of her CPS caseworker Carressa Cherry:

- In May 1999, CPS ruled "reason to believe" negligent supervision of Damon.

- In March 2001, CPS ruled "reason to believe" physical abuse of Jeremy and Darren.

- In April 2007, CPS ruled "reason to believe" negligent supervision of Jeffrey.

Mother was nine months' pregnant with C.C. when she was arrested for possession of methamphetamine, and she admitted that she used methamphetamine throughout her pregnancy with C.C. Mother started using methamphetamine twelve years before C.C.'s birth, "when they took [her] first child," and has been addicted ever since. The longest period of time that she has been off of drugs is two years, while incarcerated. Mother also testified about her abusive relationship with Darren's father, with whom she stayed with for "umpteen years."

Cherry testified that Mother did not complete her service plan, but Mother did complete some services available to her in prison, such as Community Addiction Treatment Services (CATS) and Alcoholics Anonymous, in addition to

bible study. Mother testified that she never received the revised service plan, which Cherry claimed she sent regarding services Mother could receive while incarcerated, and that she had never taken a parenting class or an anger management class. Mother asserted that during her most recent stay in jail, she had changed, stating, "I've taken a year to change my attitude and my ways, my way of thinking. I went to every available class that there is. I'm a better person from who I was to who I am."

Mother was diagnosed by Tarrant County MHMR with severe depression and methamphetamine addiction and takes medication for her depression. She disagreed that she had tried to interfere with a relative's permanent managing conservatorship of Jeffrey, her second youngest child—one of the reasons Cherry gave for the Department of Family and Protective Services (DFPS) seeking to terminate Mother's parental rights and to seek adoption by relatives in C.C.'s case.

Mother testified that upon her release from prison, she planned to continue services to help treat her drug addiction, and until she could properly provide for C.C., she wanted him to remain with her sister. She stated that she had no employment opportunities lined up for after her release from jail and that, from age eighteen to thirty-eight, the longest period of time that she has ever held a job was two to three years. Although under a court order to pay child support,

she has never done so. She testified that she would probably move in with Jeffrey's father when released from jail.

Cherry testified that Mother's sister and her husband wanted to adopt C.C., and no one disputed that, in Mother's words, it was best for C.C. "to be where he's at." Mother stated, "I know that my sister has a loving and stable home," but she asked the trial court to make her sister C.C.'s permanent managing conservator instead of terminating her parental rights to him. Cherry testified that Mother's parental rights to C.C. should be terminated because

> [a]t this time, [Mother] is not able to parent [C.C.] I have not been able to see first-hand her interaction or parenting skills with him because she has been incarcerated the length of this case; however, [Mother's] previous history indicates that she has difficulty with violence, criminal involvement, and drug abuse.
>
> [Mother] has other children she was unable to raise due to her drug abuse and unsafe environment.
>
> [Mother] has not been able to provide a safe environment for her other children. There has been a pattern of behavior that's spanned at least 12 years, including numerous criminal convictions and CPS history.

She added that Mother had other children that are being raised by relatives because of her inability to provide for them and to protect them,[4] and Mother's history of violence and inability to raise her other children indicated that she would also be unable to raise C.C.

---

[4]Mother testified that she retained the parental rights to all of her other children.

C.C. was placed in foster care after his birth on June 5, 2009, and the trial court appointed Mother's sister and her husband as C.C.'s temporary possessory conservators on December 3, 2009, after CPS performed a home study. Cherry described C.C. as a very well-adjusted, happy baby.

Cherry described the parenting skills of Mother's sister and husband, stated that they have created a "very loving, stable home" for him, and added,

> They've lived in the same residence for over 19 years. They have a very stable, loving relationship with one another as well as with [C.C.], and their older son, I've watched this interaction on numerous occasions. They have maintained continued contact with [C.C.], even before he was placed in their home. They visited him and maintained that contact with him. They've been probably the most stable adults in his life since his birth, because they were visiting even beforehand, before he was placed in their home. The home is very well-maintained, it's a quiet neighborhood, they do have a security system. There are no safety hazards in the home.

She described Mother's sister and husband as employed and with the financial means to provide for C.C. Cherry stated that they told her that they would not hesitate to call the police or CPS if anyone, including a family member, were to threaten C.C.'s well-being and that they have called the police on Mother before with regard to protecting Mother's other children.

The trial court found by clear and convincing evidence that Mother knowingly placed or knowingly allowed C.C. to remain in conditions or surroundings that endangered his physical or emotional well-being, that she engaged in conduct or knowingly placed C.C. with persons who engaged in conduct that endangered his physical or emotional well-being, and that

6

termination of Mother's parental rights was in C.C.'s best interest.[5]  *See* Tex. Fam. Code Ann. § 161.001(1), (2) (Vernon Supp. 2010).  This appeal followed.

## III.  Factual Sufficiency

In her sole issue, Mother complains that the evidence is factually insufficient to support the trial court's best interest finding.  She does not appeal the trial court's endangerment finding.

## A.  Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination

---

[5]The trial court terminated C.C.'s father's parental rights after he executed a voluntary affidavit of relinquishment.

proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001, § 161.206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own.

8

*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). In evaluating the parent's willingness and ability to provide the child with a safe environment, we consider the factors set out in family code section 263.307(b). *Id.* § 263.307(b) (Vernon 2008). Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

9

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

(F)  the plans for the child by these individuals or by the agency seeking custody;

(G)  the stability of the home or proposed placement;

(H)  the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)  any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**C. Analysis**

Mother argues that the evidence is factually insufficient to support the trial court's best interest finding because although there was evidence of her past poor decision making and criminal conduct, there was insufficient evidence of

10

each *Holley* factor for the trial court to form a firm belief or conviction that termination was in C.C.'s best interest. Specifically, she complains that there was little or no evidence to show (1) that C.C. has any special physical or emotional needs beyond those of a normal child; (2) that DFPS offered little evidence regarding whether Mother could meet C.C.'s physical and emotional needs in the future; (3) that DFPS offered little evidence regarding whether Mother would endanger C.C. in the future; (4) that no clear and convincing evidence of her ability or inability to parent C.C. exists; and (5) that there was no evidence presented of programs or financial assistance available to aid Mother in serving C.C.'s best interest in the future.

Mother relies on *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.), and *In re D.T.*, 34 S.W.3d 625, 642 (Tex. App.—Fort Worth 2000, pet. denied), to support her factual insufficiency argument. Both cases are inapposite.

In *W.C.*, DFPS removed the children from their mother because she failed to protect them from their father, who resumed his physical and sexual abuse of the children after she allowed him back into the family home upon his release from jail on a conviction for injury to a child. 98 S.W.3d at 755–56. The record reflected that the mother was devastated when she learned about the sexual abuse and threw away everything—including furniture—that would remind the

11

children of their father and the abuse they suffered at his hands. *Id.* at 761–62, 764.

We held that the evidence on the best interest finding was factually insufficient because, among other things, the mother fully complied with her service plan in all respects except for her court-ordered child support payments, she visited her children regularly and used proper discipline, she maintained suitable employment, she lived in her own apartment deemed by DFPS as a "safe living environment," and she "made significant progress in alleviating the causes for the children's removal from her home." *Id.* at 765. And we stated that while there was evidence of past poor parenting skills, poor decision making, and inadequate protection of the children, because the mother did everything she had been asked to do and because no significant event occurred between the time DFPS planned to return the children to her and the time of the termination trial, the evidence to support the best interest finding was factually insufficient. *Id.* at 766 ("We conclude that this case is one where appellant's offensive behavior is not egregious enough, on its own, to warrant a finding that termination is in the children's best interest.").

Likewise, in *D.T.*, DFPS's predecessor agency conceded that the mother complied in all possible respects with her service plan, and the record reflected that the mother's overall concern was ensuring her child's safety. 34 S.W.3d at 640. That is, the mother herself contacted the agency to temporarily place the

child after she was arrested, and she attempted to comply as fully as possible with the goals and objectives the agency required to facilitate reunification. *Id.* While in prison, she wrote letters to inquire about her child and to request photographs and visits, and she participated in classes and counseling sessions. *Id.* Additionally, the underlying offense for which she went to prison was writing bad checks, not using or possessing illegal drugs. *Id.* at 637.

Here, Mother openly admitted to the trial court that her sister's home was the best place for C.C. From this admission, and all of the other evidence presented at trial, the trial court could have concluded that terminating Mother's parental rights to C.C. so that Mother's sister could adopt him would be in C.C.'s best interests. That is, Mother's own criminal history includes a conviction for injury to a child and several convictions for assault on family members, as well as drug use, unlike either parent in *W.C.* or *D.T. See In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) ("While Appellant's history, admissions, and conduct relating to drug abuse, and her inability to maintain a lifestyle free from arrests and incarcerations[,] support the jury's endangerment finding, this evidence is also relevant to a best interest determination."). Further, her history of abusive relationships shows that she has been both abuser and abused and, contrary to Mother's assertion that no clear and convincing evidence of her inability to parent exists, her CPS history and her two oldest children's incarcerations seem to demonstrate that she has already failed twice to

13

successfully raise children to become law-abiding adults. Finally, from her inability to explain how she would take care of herself, let alone a very young child, once released from jail, the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship would be in C.C.'s best interest.[6] *See* Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28. We overrule Mother's sole issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, J.; LIVINGSTON, C.J., and DAUPHINOT, J.

DELIVERED: December 23, 2010

---

[6]DFPS did not have to present evidence that C.C. had any special needs or that there could be programs or financial assistance available to Mother in the future for the evidence, based on the entire record in this case, to be factually sufficient. *See C.H.*, 89 S.W.3d at 27 (noting that not all *Holley* factors may be applicable in any given case).

14